219 Cal.App.2d 809 (1963)
In re INTERSTATE INDEMNITY COMPANY in Liquidation. F. BRITTON McCONNELL, as Insurance Commissioner, etc., Petitioner and Respondent,
v.
INDUSTRIAL INDEMNITY COMPANY et al., Cross-petitioners and Appellants.
Civ. No. 26572. 
California Court of Appeals. Second Dist., Div. Four. 
Sept. 6, 1963.
 Thelen, Marrin, Johnson & Bridges and Edward J. Ruff for Cross- petitioners and Appellants. *811
 Stanley Mosk, Attorney General, and Arthur C. de Goede, Deputy Attorney General, for Petitioner and Respondent.
 BURKE, P. J.
 For some time prior to October 30, 1958, Interstate Indemnity Company had been engaged in the business of writing policies of insurance covering the liability of employers under the workmen's compensation laws of this state. On that date, because of the company's insolvency, the Insurance Commissioner of the State of California (Commissioner) was appointed as its conservator.
 In order to provide immediate and continuing payment to the injured workmen, the Commissioner solicited the cooperation, on a nonprofit basis, of a group of insurance companies also writing workmen's compensation insurance and requested the execution of a reinsurance and assumption agreement, providing for the reinsurance and assumption of the liabilities of the insolvent insurer under workmen's compensation policies issued by that company. The reinsurers were advised by the Commissioner that the latter had issued his finding on November 14, 1958, that "Interstate Indemnity Company has ceased to do workmen's compensation insurance business in the State of California and that the bond referred to in Insurance Code section 11699 and related statutes should be and it is hereby fixed by [the Commissioner] at the amount of $363,272.00 as the amount which [the Commissioner deems] sufficient for the protection of the beneficiaries having claims under California Workmen's Compensation insurance policies issued by said Interstate Indemnity Company."
 The group of insurance companies entered into such reinsurance and assumption agreement with the Commissioner in his capacities both as Commissioner and as conservator of Interstate Indemnity Company. The Industrial Indemnity Company of San Francisco, California, was designated as the administrator of the agreement on behalf of, and for the account of, all the subscribing reinsurers.
 The agreement recited that it was executed in consideration of the subscription of the subscribing insurers and the "transfer by the Commissioner to the respective deposit accounts of the subscribing insurers, ... of the securities, funds or bonds heretofore deposited by, or which may hereafter be deposited in accordance with requirements of applicable laws to the deposit account of, Interstate Indemnity Company, ..." The agreement further provided that, "The Commissioner hereby transfers and agrees to execute all documents *812 required to effectuate transfer to the deposit accounts of each subscribing insurer such portion of the securities, funds or bonds heretofore deposited by or hereafter to be deposited for the account of Interstate Indemnity Company as is proportionate to the respective amount of liability assumed by each subscribing insurer."
 In addition, the agreement noted the estimated total workmen's compensation liabilities ($363,272) and the face value ($117,000) of the deposits and declared "that the amount of future additional deposits of this kind, if any, is unknown and that [the Commissioner] makes no estimate with respect thereto."
 The agreement provided further: "It is intended that the securities and funds heretofore deposited and which may be hereafter deposited to the deposit account of Interstate Indemnity Company or to the deposit account of subscribing insurers under Insurance Code Section 11715 shall operate to reduce the ultimate amount of the liability assumed by the subscribing insurers so that subscribing insurers will fully pay said compensation benefits but their net loss will be the difference between the value of all said securities, funds or bonds and the total amount of such compensation benefits. The Commissioner agrees to diligently take all lawful procedures and actions to carry out this intent."
 The agreement further provided that "In the event that the payments made pursuant [thereto] by the respective subscribing insurers in excess of the value of the securities and funds deposited under Insurance Code Section 11715 entitle such subscribing insurer to the rights of general creditors, it is understood that the execution of this Agreement shall not either enlarge or diminish any such rights."
 Under the agreement the insurers, reinsuring, assumed all liabilities for workmen's compensation benefits of the defunct insurance company as above stated, but fractionally as to each, in accordance with a method of proportional liability set forth in the agreement.
 The agreement was approved by the superior court on November 21, 1958, which became the effective date of its execution, and later in the afternoon of the same day an order to liquidate issued from the superior court appointing the Commissioner, who on October 30, 1958, had been appointed conservator of Interstate, as liquidator of the company. Thereupon the reinsurers proceeded to pay the claims of the workmen's compensation insurance claimants and the Commissioner *813 as liquidator proceeded with the liquidation of the defunct company.
 On September 25, 1961, the Commissioner, as liquidator, filed his report and account and petitioned the court for authorization to pay a first dividend on creditors' claims against Interstate as filed with him. Industrial Indemnity, for itself and for the other reinsurers, answered the petition, claiming there should be a prior distribution of funds to them by the application of funds in the hands of the liquidator to augment the deposit account of the insolvent company. They pointed to the finding of the Commissioner that the amount of the bond required of Interstate was $363,272 and asserted that Interstate, or its successors, the conservator, or liquidator, were obligated under Insurance Code sections 11699 et seq. (including 11715) and the reinsuring agreement to deposit with the Commissioner the difference between that amount and the preexisting deposit of $117,000; further, that under the agreement, the Commissioner was in turn obligated to turn over any such additional deposits to the reinsurers against claims paid by them.
 The petition and answer thereto were heard by the court. The answer and cross-petition of Industrial Indemnity were denied on the merits, the court ruling that there was no obligation upon the conservator to augment the deposit of securities to Interstate's account. The court approved the report and account and authorized payment of the dividend to the general creditors of Interstate as prayed. Industrial Indemnity Company, for itself and the other parties to the reinsurance and assumption agreement, appeals from the order so made. [fn. 1]
 Whatever considerations of public relations or policy may have moved the reinsuring companies to enter into such a non-profit agreement, at the special request of the Commissioner, clearly a substantial part of the consideration for the assumption by such companies of over $300,000 of potential liability against a present asset of $117,000 was the expectation that the funds which they would pay out in workmen's compensation benefits owed by the defunct company would ultimately be offset by funds secured in the course of liquidation *814 through the collection of unpaid premiums, at least to the extent available.
 [1] In determining whether it was an obligation on the part of the Commissioner in his capacity as conservator or liquidator to augment such deposit under applicable laws we turn first to Insurance Code section 11696 which required the Commissioner to compel Interstate to file an additional bond (or deposit funds in lieu thereof under section 11715) whenever he found, as he did on November 14, 1958, that the amount of the bond or deposit then on file was insufficient. Likewise, under section 11701, upon Interstate's ceasing to do business, it was the duty of the Commissioner to fix the bond in the amount he deemed sufficient for the protection of the beneficiaries of the policies of such insurer. Thus, under applicable law, section 11690 et seq. of the Insurance Code, we hold it is made mandatory for an insurer to maintain bonds, or deposits, in accordance with the requirements of the Commissioner; also, that Interstate's conservator and liquidator are under obligation to comply with the finding of the Commissioner of November 14, 1958. [fn. 2]
 [2] Respondent's contention that the agreement created an unlawful preference must fail. The agreement was submitted to the superior court and was approved by the court in the exercise of its general powers of supervision of the conservatorship. The order of approval has long since become final. It is well settled that a final order of the superior court is thereafter res judicata as between the parties before the court. The implicit determination in the order of approval that the agreement approved was one within the lawful powers of the Commissioner is not now open to reexamination. *815
 [3a] However, assuming the matter were still open for determination, we regard it as clear that the relief sought by appellant is entirely in accord with the statutorily created priority of compensation claims and does not create an invalid preference.
 [4] Pursuant to the broad powers vested in it by the California Constitution, article XX, section 21 (1911), the Legislature was given "plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workmen's compensation," and the Workmen's Compensation Law has been established with the dominant purpose of securing to injured employees immediate and continuing compensation assistance during the period of their disability irrespective of the fault of any party.
 [5a] Section 4908 of the Labor Code gives workmen's compensation claims the same preference over the other debts of the employer, or his estate and of the insurer which is given by the law to claims for wages. The section extends such preference to the entire amount of the compensation to be paid, unlike the preference accorded claims for wages which extend only to wages earned in the 90-day period of employment prior to insolvency.
 The preferential nature of a wage claim is established by the provisions of section 1204 of the Code of Civil Procedure. The section applies to "any proceeding in insolvency or receivership." Further, the second paragraph of the section expressly binds all the courts of this state and provides that in all receivership actions the court must order the receiver to pay such preferred labor claims promptly out of the first receipts of the receivership. [6] The conservator acts as a statutory receiver. (Caminetti v. Guaranty Union Life Ins. Co., 22 Cal. 2d 759 [141 P.2d 423].)
 [5b] Thus, regardless of any agreement between the conservator and appellant, workmen's compensation claims enjoy preferred status as against the claims of other creditors. By entering into an agreement with appellant, the Commissioner found a way, commendably, for the prompt payment of the claims of injured workmen. In doing so, however, he could not relieve the assets of Interstate from being impressed with the preferred liens of such claimants.
 [7] The conservator and liquidator, as successor to the obligations of Interstate, remained obligated to the workmen's compensation claimants under the compensation policies issued by Interstate, and any funds accruing to the accounts *816 of Interstate were chargeable with such preferred claims.
 [3b] The assumption and reinsurance agreement was executed to implement the prompt and preferred payment of claims to injured employees, eliminating the necessity of processing such compensation claims through the insolvent estate. In lieu of such claims, however, which the conservator no longer had to process and entertain, there remained the substituted obligation, which he undertook, to transfer securities, funds or bonds to the reinsurers as required by law and the agreement. Such an agreement is in accord with the priority conferred by statute on such claims.
 Parenthetically, from the point of view of equity, in the absence of any assumption and reinsurance agreement, the compensation claimants would have been required to present their claims to the conservator where they likewise would have enjoyed the preferred status accorded to them by operation of section 4908 of the Labor Code. However, the conservator would have had the obligation to process and administer all of such claims at the expense of the estate, whereas, under the assumption and reinsurance agreement, such cost was assumed by the reinsurers. Thus, the agreement has benefited the general creditors.
 The conservator also contends that appellant may not change its theory of recovery on appeal. We find there has been no change and that the theory of recovery advanced by appellant is correct; that the rights of the reinsurers stem from the assumption and reinsurance agreement. The provisions of the Labor Code and the Insurance Code requiring deposits to be made must be read into the agreement since they are the "requirements of applicable laws" referred to in the agreement. [8] The conservator is obligated first to apply the assets in liquidation to augment the required deposits in order to comply with the Commissioner's order fixing the amount necessary to protect claimants.
 Respondent also argues that the claims filed by appellant with the liquidator were filed as general claims only and must be paid only on a ratable basis with all claims against the insolvent. We think it clear, as did the trial court, that appellant sought such relief in the alternative, by filing general claims, understandably desiring at least a ratable payment if its contention for priority by express contract was denied.
 The findings of fact, conclusions of law and order of the superior court approving the account and petition of the conservator and authorizing payment of a dividend to the *817 general creditors are vacated. The cause is remanded to the trial court with directions to enter findings of facts, conclusions of law, and an order giving effect to the rights of appellant, under the assumption and reinsurance agreement and applicable laws, to have transferred to the respective deposit accounts of the subscribing insurers the total sum of securities, funds or bonds of Interstate Indemnity Company in the hands of its liquidator found necessary by the Commissioner on November 14, 1958, less the value of securities, funds or bonds heretofore deposited. In the event the value of all such securities, funds or bonds exceeds the total amount of the compensation benefits paid pursuant to the reinsuring agreement, the residue shall be returned to the liquidator as general assets of the estate.
 Jefferson, J., and Kingsley, J., concurred.
 As part of the codification, the quoted phrase was deleted and the single word "shall" substituted in its place; the drafters of the code retained the same meaning in the statutes by providing in section 16 that the word "shall" should be mandatory whenever used throughout the code.
NOTES
[fn. 1] 1. For convenience we have used the term "appellant" to refer not only to the named appellant but also, as the context will indicate, to all of the reinsuring carriers on whose behalf the present appeal is prosecuted.
[fn. 2] 2. It is worth noting, from the legislative history of the code sections relating to augmentation of the deposits, that the predecessor of the present statutes was entitled "An act to provide for the protection of beneficiaries of workmen's compensation insurance policies against the default or insolvency of insurance carriers issuing such policies by requiring such carriers to provide security for the payment of such compensation." Section 6 of the act of 1917 (Stats. 1917, ch. 200, p. 292) provided that, in the event the findings now specified in sections 11696 and 11701 are made, the Commissioner "shall have the right, and it shall be his duty, to require" augmentation of the security deposit. (Italics added.) This language, obviously mandatory in meaning, was retained in the statutes until 1935, when all laws relating to insurance were codified in the present Insurance Code.